**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**DAVID SYDNOR** **PLAINTIFF**

**v.** **CASE NO. 6:23-CV-6081-SOH**

**CITY OF HOT SPRINGS,**
**ARKANSAS, et al** **DEFENDANTS**

# BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants Harmony Morrissey, Lt. James Eric Stockwell, and Lana Kelly, each in their individual and official capacities, and the City of Hot Springs, Arkansas ("City"), by and through undersigned counsel, Gabrielle Gibson, and for their Brief in Support of Defendants' Motion for Summary Judgment, state as follows:

## INTRODUCTION

In his Complaint, Plaintiff David Sydnor ("Plaintiff") asserts a Fourteenth Amendment Equal Protection claim and Due Process claims under 42 U.S.C. § 1983, parallel Arkansas constitutional claims under the Arkansas Civil Rights Act ("ACRA"), and a gross negligence claim. ECF Doc. 3. He alleges that he had a protected property interest in obtaining a transportation permit from the City, which he was denied, and he was treated differently than similarly situated comparators. *Id*. Defendants previously moved for summary judgment on the issue of subject matter jurisdiction. Defendants argued that because the City Board of Directors ("City Board") has never considered Plaintiff's transportation permit application, never rendered a final, administrative decision, and never denied him a permit, Plaintiff had not suffered an injury-in-fact, and the case was not ripe for consideration by this Court. ECF Docs. 18-20, 28. The Court

denied the motion, finding that under Plaintiff's version of the facts, he has alleged an injury-in-fact and, thus, has standing. ECF Doc. 34. The Court noted that the parties may proceed with discovery and later dispositive motions on the merits. *Id*.

Defendants now file the instant motion because Plaintiff lacks proof on essential elements of his claims, and they must be dismissed. Plaintiff cannot show: (1) that Defendants deprived him of a protected property interest through a constitutionally inadequate process; (2) that Defendants' actions were arbitrary, capricious, and not justified by any legitimate governmental interest; (3) that Defendants treated him differently compared to similarly situated persons without any rational basis; or (4) that a City policy or custom was the moving force behind the alleged constitutional violations. For these reasons, Defendants are entitled to qualified immunity in their individual capacities, tort immunity pursuant to Ark. Code Ann. § 21-9-301, and summary judgment as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The moving party may discharge its burden by pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Washington v. City of St. Louis, Missouri*, 84 F.4th 770, 773 (8th Cir. 2023) (internal quotations omitted)). Further, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome

determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). Substantive law identifies which facts are material. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The nonmoving party is obligated to meet proof with proof. *Bolderson v. City of Wentzville,* 840 F.3d 982, 986 (8th Cir. 2016). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985).

## ARGUMENT

The undisputed record shows that the City Board is the sole final decisionmaker, and it never considered or denied Plaintiff's permit application, which remains open pending required information. **SUMF ¶ 11, 43.** The Transportation Advisory Committee ("TAC") is advisory only. **SUMF ¶ 9-10.** At the TAC's September 18, 2019, meeting, the committee voted to recommend Plaintiff's downtown route for approval; the committee did not have all the necessary information to vote on a permit recommendation to the Board. **SUMF ¶ 13-16.** After the first TAC meeting, Defendants Morrissey and Kelly repeatedly sought consistent, missing information for Plaintiff's application, but Plaintiff

never provided it. **SUMF ¶ 19, 21-22, 30, 34-35, 39-40.** Defendant Stockwell merely performed a vehicle inspection on Plaintiff's motor vehicle, Bubbles, in May of 2020 with the opportunity to cure any deficiencies, which Plaintiff did. **SUMF ¶ 26-28.** On July 6, 2020, Plaintiff provided Defendant Morrissey with new routes, new photographs, and the vehicle examination. **SUMF ¶ 29.** In turn, Plaintiff received a written notice of the July 24, 2020, TAC hearing but chose not to attend. **SUMF ¶ 30-31, 34, 40.** The TAC voted 4-0 not to recommend forwarding the matter to the City Board due to Plaintiff's absence, incomplete application items, undefined route(s), confusion with the name of the company, and safety concerns. **SUMF ¶ 40.**

Plaintiff, just like any other applicant, was provided notice, an opportunity to be heard, and robust communication from the Defendants in an attempt to complete his application and satisfy legitimate safety concerns in compliance with City Code and state laws. As shown below, these undisputed, material facts foreclose any due process, equal protections, negligence, or *Monell* liability.

## I. Plaintiff's Fourteenth Amendment procedural and substantive due process claims fail because Plaintiff does not have a protected property interest of which he was deprived, he was given notice and an opportunity to be heard, and there is a rational basis for Defendants' actions.

The Due Process Clause of the Fourteenth Amendment contains both procedural and substantive components. *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). Before analyzing either claim, the claimant must identify a property interest at stake. *Bishop v. Tice*, 622 F.2d 349 (8th Cir. 1980). To determine whether a property interest is at stake, courts look to state law. *Roth*, 408 U.S. 564, at 577. Under Arkansas law, an individual may acquire "a kind of property interest" in a municipal permit once it is issued.

*Tankersley Bros. Indus. v. City of Fayetteville*, 227 Ark. 130, 296 S.W.2d 412 (1956). Defendants could find no authority, state or otherwise, for the proposition that an individual possesses a property interest in a permit that a city *might* grant.

In determining whether a benefit implicates a property interest, the plaintiff must have "a legitimate claim of entitlement to it." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("*Roth*"). This must be "more than a unilateral expectation" of receiving the benefit. *Id.* A plaintiff must show that the relevant statute "does not leave 'considerable discretion' in the hands of [the decisionmaker]." *McGuire v. Indep. Sch. Dist. No. 833*, 863 F.3d 1030, 1035 (8th Cir. 2017) (quoting *McDonald v. City of Saint Paul*, 679 F.3d 698, 705 (8th Cir. 2012)). Eligibility for a government benefit does not necessarily create an entitlement to such a benefit. *Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385, 391 (8th Cir. 1986). If no set of facts would compel the issuance of the benefit, there is no "legitimate claim of entitlement," and therefore, there is no protectable property interest. *Hill*, 799 F.2d at 393.

Under the City's Code, vehicles for hire fall into two broad categories. The first category consists of motor carriers, which the City organizes as Taxicabs, Limousines, Sightseeing Vehicles, and Charter Services. **SUMF ¶ 34-37**; see also, Ark. Code Ann. § 14-57-201 (Municipalities may "regulate and tax all motor carriers operating within their corporate limits"). The second category consists of public or private transportation, including Trams, Special Events Buses, Public Transit, Specialty Transit, and Airport Transit. *Id.; s*ee also*,* Ark. Code Ann. § 14-334-105 (Municipalities are "empowered to acquire, own, equip, construct, lease, maintain, license, and regulate public and private

public transportation"). The categories at issue here are Sightseeing vehicles and Specialty Transit. The City defines a "Sightseeing vehicle" as:

> all motor vehicles which are operated for conducting *sightseeing tours* for the general public which have seating capacity in excess of eight passengers including, but not limited to, an amphibious vehicle known as a "duck" and which is utilized for the purpose of conducting sightseeing tours[1].

*Id.* (emphasis added). For sightseeing vehicles, hearing officers "shall conduct a public hearing to determine whether the applicant is fit, willing and able to properly perform the service proposed and to conform to this chapter and other applicable laws, ordinances and regulations." *Id.* When making a recommendation, the hearing officers shall take into consideration:

> (1) The character, business and financial responsibility and experience of the applicant and the probability that, if granted a permit or additional vehicle licenses, the applicant will operate his/her vehicle in accordance with the provisions of this chapter.
>
> (2) Whether any increase in the number of such vehicles operating in the city would produce or substantially increase traffic congestion.
>
> (3) If the application is for a sightseeing or charter service to be operated within the Downtown Business District, the following additional criteria shall be considered […]
>
> (4) *Any other factors* directly related to the grant or denial of the application which would substantially affect the public safety or convenience.

Exhibit 12, § 13-1-13(3)(a). The Board of Directors considers the same factors when making its final determination. Exhibit 12, § 13-1-13(3)(c).

[1] A "tour" is "a journey for business, pleasure, or education often involving a series of stops and ending at the starting point." TOUR, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/tour (Accessed June 8, 2026).

The City defines "Specialty Transit[2] Service" as "the operation upon the streets of Hot Springs of any vehicle for hire which is drawn by horse, mule or other animal or any other novelty-type vehicle." *Id.* When granting a franchise agreement for Specialty Transit vehicles,

> [t]he board of directors is authorized to grant by ordinance one or more franchises for the operation of specialty transit […] Said specialty transit shall operate for the purpose of transporting passengers for hire along a specified route(s); provided, that the duration, terms, franchise fee, rates, insurance, conditions and procedures for granting and operating such franchise(s) are clearly stated in the franchise agreement and are *fair, reasonable and in the public interest as determined by the board of directors* . . ..

Exhibit 12, § 13-1-111 (emphasis added).

Irrefutably, both permits and franchises require the City Board to weigh various factors, including public safety, convenience, and public interest, and to analyze the facts underlying each application. They are not issued based merely on meeting minimum eligibility or procedural requirements. The City Board's decision to grant a transportation permit or franchise is discretionary because there is no set of facts that would compel it to grant a permit or franchise. Accordingly, Plaintiff does not have a legitimate claim of entitlement to a permit or franchise. *McGuire,* 863 F.3d at 1035. He only has a "unilateral expectation" of receiving a permit or franchise and, thus, no protected property interest. *See Roth*, 408 U.S. at 577. Plaintiff cannot point to any authority establishing that he has a property interest in his expectation to be granted a permit or to receive a franchise. For this reason alone, his due process claims must be dismissed.

---

[2] "Transit" means "conveyance of persons or things from one place to another[.]" TRANSIT, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/transit (Accessed June 8, 2026).

**a. Even if Plaintiff could establish that he had a protected property interest, his procedural due process claim fails because he was afforded notice and opportunity to be heard.**

To satisfy due process, "a deprivation of life, liberty, or property [must] be preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quotation and citation omitted). Generally, a plaintiff need not exhaust state remedies prior to filing a § 1983 suit. *Hopkins v. City of Bloomington*, 774 F.3d 490, 492 (8th Cir. 2014). However, the Eighth Circuit recognizes an exception for procedural due process claims. *Id.*

"Under federal law, a litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983." *Id.* (quoting *Keating v. Neb. Pub. Power Dist.,* 562 F.3d 929, 929 (8th Cir. 2009)). This is because "[a] plaintiff cannot complain of a violation of procedural due process when he has not availed himself of existing procedures." *Raymond v. Bd. of Regents of the Univ. of Minnesota*, 847 F.3d 585, 590 (8th Cir. 2017) (citation and quotation omitted).[3] Further, a plaintiff alleging futility as the reason for not exhausting his remedies must "establish, with certainty, that the final outcome of the process would have been adverse to [the plaintiff]." *Raymond*, 847 F.3d 585, 592 (8th Cir. 2017). "Unsupported and speculative claims of futility do not excuse a claimant's failure to exhaust his or her administrative remedies." *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 898 (8th Cir. 2009) (citation and quotation omitted)

[3] *See also, Padda v. Becerra*, 37 F.4th 1376, 1383 (8th Cir. 2022) (no due process violation when doctor voluntary chose to forego judicial review procedure); *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571 (8th Cir. 2021) (no due process violation when suspended college athletes did not appeal subcommittee decision to Minnesota Court of Appeals).

Here, Plaintiff's due process claim must fail because he was afforded both notice and an opportunity to be heard by the City, but he declined to attend the hearing. On July 7, 2020, Ms. Morrissey emailed Ms. Mary Verrinder, Plaintiff's co-applicant, to inform her that the amended application had been sent to City staff and that a public TAC hearing would be set. **SUMF ¶ 30-31.** Ms. Morrissey mailed Plaintiff an official letter on July 15, 2020, that informed him of the TAC hearing on July 24, 2020. **SUMF ¶ 34**. Ms. Morrissey also told Plaintiff the specific information that TAC would need before rendering a decision. *Id.* Plaintiff responded via email on July 22, 2020, asking why he should attend the hearing. **SUMF ¶ 38**. After the July 21, 2020, City Board meeting, the City Attorney spoke with Ms. Verrinder and stressed the importance of attending the hearing with Plaintiff. **SUMF ¶ 39**. At any public hearing held under the City Transportation Code, the applicant "may present witnesses or other evidence, may be represented by an attorney and may cross-examine opposing witnesses." **SUMF ¶ 34.**

Instead, Plaintiff declined the opportunity to attend the TAC hearing held for him. He called the hearing a "polite lynching" and by attending, he would be "supply[ing] the rope." **SUMF ¶ 39.** Plaintiff wrote, "We decline. Our answer is NO!" *Id.* Plaintiff merely speculates that the second hearing was futile because "[t]hey forged all our records to fail and sent them city wide to force a new hearing." **SUMF ¶ 38-39.** This baseless claim of futility is not supported by any evidence in the record and definitely does not "establish, with certainty, that the final outcome of the process would have been adverse to [the plaintiff]." *Raymond*, 847 F.3d 585, 592 (8th Cir. 2017). To the contrary, it is undisputed that Defendants Morrissey and Kelly, along with other City employees,

were doing everything possible to help Plaintiff prevail at the TAC hearing. They told him repeatedly when the hearing was to be held, how important it was, and what materials and information he needed to provide to get his application in front of the City Board as soon as possible. **SUMF ¶ 30-31, 34-35, 39-40.** There is no greater "process" that the City could have afforded Plaintiff than a hearing in which he could have presented witnesses or other evidence, be represented by an attorney, and cross-examine opposing witnesses. Because Plaintiff did not avail himself of the process the City afforded him, Plaintiff's procedural due process claim must fail.

**b. Any substantive due process claim also fails because there are no fundamental rights at issue, and there is a rational basis for Defendants' actions.**

To establish a substantive due process claim, a plaintiff "must show that the law violated one of his fundamental rights, which no amount of process could repair." *Walker v. City of Kansas City, Mo.*, 911 F.2d 80, 93 (8th Cir. 1990). Substantive due process "has been invoked to shelter fundamental individual rights from governmental interference in areas of child rearing and education, family relationships, procreation, and marriage." *Id.* at 95 (citations omitted). Only those rights that are "'fundamental'" and "'implicit in the concept of ordered liberty'" are granted substantive due process protections. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65-66 (1973).

Here, Plaintiff has not alleged a violation of a right that is fundamental and implicit in the concept of ordered liberty, which no amount of process could repair. *Id.* Under Arkansas law, the right to operate as a motor carrier within a city is defined and limited by procedures established by the city, and Plaintiff's alleged harm stems from his inability to obtain a permit, which is governed by the City's procedure and the City

Board's discretion. Additionally, "[a] rational basis that survives equal protection scrutiny also satisfies substantive due process analysis." *Kansas City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City, Mo.,* 742 F.3d 807, 809 (8th Cir. 2013). As explained below, all of Defendants' actions were rationally related to the City's legitimate interest in following its Transportation Code requirements and protecting the public safety and welfare. Therefore, Plaintiff's substantive due process claim also fails as a matter of law.

## II. Plaintiff's Fourteenth Amendment Equal Protection claim fails because it is undisputed that he was not treated less favorably than other similarly situated applicants, and the Defendants had a rational basis for their actions.

"The Equal Protection Clause requires the government to treat all similarly situated people alike." *Creason v. City of Washington*, 435 F.3d 820, 823 (8th Cir. 2006) (citation omitted). When a plaintiff does not assert an Equal Protection violation involving a suspect class or fundamental right, the plaintiff must establish that he was "treated differently by the government than similarly situated persons and the different treatment was not rationally related to a legitimate government objective." *Koscielski v. City of Minneapolis*, 435 F.3d 898, 901 (8th Cir. 2006). To do so, a plaintiff "must prove similarity to other individuals or entities receiving favorable treatment." *Id.*

"'To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects.'" *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015) (quoting *Reget v. City of La Crosse,* 595 F.3d 691, 695 (7th Cir. 2010)). In such cases, "[a] class-of-one plaintiff must therefore provide a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations."

*Id.* (cleaned up). The requirement to show intentionally different treatment from others similarly situated is not eliminated by showing "'vindictive action, illegal animus, and ill-will.'" *Barstad v. Murray Cnty.*, 420 F.3d 880, 887 (8th Cir. 2005) (citing to *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). Instead, the plaintiff must show that he has been "'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Id.* (quoting *Olech,* 528 U.S. at 564).

Furthermore, in this context, "'it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.'" *Kansas City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City, Mo.*, 742 F.3d 807, 810-811 (8th Cir. 2013) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303-304 (1976)) "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 312 (1993). Stated differently, "[w]here there exist plausible reasons for the relevant government action, [the court's] inquiry is at an end." *Brandt by & through Brandt v. Griffin*, 147 F.4th 867, 882 (8th Cir. 2025) (cleaned up).

**a. Plaintiff cannot point to any identical or directly comparable individual or entity that the Defendants treated more favorably. For that reason alone, his Equal Protection claim fails.**

Plaintiff claims that the City treated the pedicabs, carriages, and Ducks more favorably than him. Foremost, none are identical or directly comparable to Bubbles. **SUMF ¶ 35-37.** Bubbles, sometimes referred to as a "beer bike," is a motor vehicle weighing 2425 pounds with four wheels powered by pedals and a 3500-watt motor.

**SUMF ¶ 1-3.** Plaintiff's intent was for Bubbles to follow routes in which the final destination was the starting point to sightsee around the City. **SUMF ¶ 1, 13-14.** Throughout the application process, the number of seats was inconsistently represented to the City, but the number remained more than eight. **SUMF ¶ 1, 14, 17, 26, 29.** The width of the vehicle had also been inconsistently represented, ranging from "79 inches" on the shipping documents, to "about 6 feet wide" in the TAC meeting minutes. *Id*. The pedicabs and rickshaws typically transport one or two people and do not weigh nearly as much as Bubbles. **SUMF ¶ 37.** The carriages are horse-drawn and typically have a weight of around 1000 pounds and carry up to four passengers. *Id*. The pedicabs and carriages are classified as specialty transit services. *Id*. Plaintiff contends the Ducks are the most similar to Bubbles; however, they are sightseeing vehicles. **SUMF ¶ 36.** The rickshaws never received a permit or franchise. **SUMF ¶ 37.**

None of these vehicles are identical or directly comparable. Because Plaintiff cannot show that an identical or directly comparable individual or entity was treated more favorably, his equal protection claim fails for that reason alone. Out of an abundance of caution, Defendants analyze the ways in which Plaintiff claims to have been subjected to less-favorable treatment. ECF Doc. 3, ¶ 42. By and large, these naked assertions reflect Plaintiff's misunderstanding of the City's governance and Transportation Code, along with the difficulty in classifying Bubbles absent complete, consistent information.

**i. Even if Plaintiff could point to a similarly situated entity, requiring ARDOT approval does not violate the Equal Protection Clause because all permit holders within the City are required to follow state and federal law.**

Plaintiff asserts that he was treated less favorably because he was required to receive ARDOT approval for Bubbles. ECF Doc. 26, ¶¶ 13, 16; ECF Doc. 32, at 3(A). While it is true that the City does not require every permit applicant to receive ARDOT approval, it does require that all transportation permit holders adhere to state and federal law, which necessarily varies based on the type of vehicle and the location of operation. **SUMF ¶ 23.** For example, there are restrictions on the trolley service imposed by the federal National Park Service and restrictions on the Ducks imposed by the Coast Guard. **SUMF ¶ 36.**[4]

Additionally, vehicles traveling on Central Avenue often encounter overlapping regulation by City, state, and federal governments because Central Avenue is contiguous with Arkansas Highway 7 and adjacent to Hot Springs National Park. **SUMF ¶ 23.** The bicycles, pedicabs, and horse-drawn carriages are not "motor vehicles" and, as such, do not require any analogous state or federal permits as are required for the Ducks and the trolley. However, the City still requests that these types of vehicles be reviewed by ARDOT to prevent any potential future issues. *Id.* Accordingly, it is undisputed that Plaintiff cannot point to any permit holder or franchisee whom the City has allowed to operate outside of state and federal law. Even if it were possible to show any difference in treatment, that difference is rational given the significant differences between Bubbles, a "bizarre vehicle," and all other vehicles operating in the City. **SUMF ¶ 36-37.**

**ii. Even if Plaintiff could point to a similarly situated entity, a second TAC hearing was necessary because he made material changes to his application, and no individual or entity has been allowed to make such changes without another hearing.**

---

[4] See also, 36 C.F.R. § 7.18 (regulating commercial passenger-carrying vehicles within Hot Springs National Park); *Land & Lake Tours, Inc. v. Lewis*, 738 F.2d 961, 964 (8th Cir. 1984) (Ducks subject to Coast Guard safety specifications and periodic inspections).

Plaintiff asserts that he was treated less favorably than other applicants because his "September 18, 2019, TAC approval" was revoked, and the City made him start the application over "from scratch" due to "his deletion of one block from the previously TAC approved downtown route[.]" ECF Doc. 3, ¶ 42(b); ECF Doc. 26, ¶ 21; ECF Doc. 32, at 3(C). However, Plaintiff cannot point to any individual or entity that the City allowed to add unapproved and explicitly disapproved routes, to alter a route after the initial recommendation of approval, to misrepresent the capacity of a vehicle without a second hearing, or to go before the City Board with incomplete, inconsistent information.

On September 18, 2019, TAC voted to recommend only the Downtown route for approval. **SUMF ¶ 16.** Aside from the fact that TAC does not have the authority to approve a permit, Plaintiff concedes that his application was not complete as of October 17, 2019, given information, such as a photograph of the actual vehicle, the current name, a map of the actual route, and a vehicle inspection were missing. **SUMF ¶ 19.** Further, Plaintiff's application was never treated as a new application; he was not required to submit another application fee or resubmit his application paperwork. **SUMF ¶ 31**. Rather, it is undisputed that there were significant differences between what was submitted to TAC in September of 2019 and the new information that Plaintiff submitted on July 6, 2020. **SUMF ¶ 29.**

On July 6, 2020, Plaintiff submitted a packet of new material to Defendant Harmony Morrissey, which contained photographs of the actual party bike and four routes on hand drawn maps: the "Little Falls Tour," the "Greenway Truck Route," the "Sgt. Stockwell Tour," and "Park Plus Sgt. Stockwell Tour." *Id*. Both the Little Falls Tour and Greenway Truck Route contained portions of the Greenway, previously rejected by

PTAC. *Id.* Neither of the "Sgt. Stockwell Tour" maps were identical to what was approved by TAC as the "Downtown route" because Central Avenue had been removed. *Id.* The completed vehicle inspection form, which Ms. Morrissey saw for the first time, listed Bubbles as a fifteen-passenger vehicle instead of the ten-seat vehicle that TAC considered in September 2019. **SUMF ¶ 29.** The name of the vehicle had changed, and the business name, "Greenway Tours," implied touring the Greenway, a plan that had been expressly disapproved by PTAC. **SUMF ¶ 18, 25, 29.**

On July 7, 2020, Ms. Morrissey sent an email to Ms. Verrinder informing her that the amended application had been sent to the Transportation Department. **SUMF ¶ 31.** It appears Plaintiff takes serious issue with the word "amended" when discussing the new information submitted in July 2020. On July 22, 2020, Plaintiff sent a letter claiming that his permit application was not amended and that he only wanted to present the "pre-approved Downtown Tour to the [City Board]." **SUMF ¶ 38.** He emailed a second handwritten letter to various City employees and officials on July 23, 2020, again stating, "We're sticking with our original approved DownTown Tour. We're dropping any additional tours." **SUMF ¶ 39.** In his deposition, Plaintiff agreed that this was a change from his earlier position of seeking a recommendation of approval for additional routes. **SUMF ¶ 38.**

Plaintiff argues that under City Ordinance § 13-1-13(7), he should have been allowed to amend his application without an additional hearing, TAC approval, or Board approval. ECF Doc. 3, ¶¶ 34, 42(d). However, Plaintiff's contention rests on the mistaken premise that he was a permit holder, rather than a permit applicant. The referenced ordinance allows a permit holder to revise the original application annually upon

payment of the permit fee. Exhibit 12, § 13-1-13(7). Nothing in the text permits an applicant to amend an initial application after TAC has made a recommendation but before the Board has issued a permit without further TAC consideration. *Id.* The City's process is clear: The City Board intends for "*all items* within the scope of authority of any advisory committee [to] be submitted to said advisory committee for consideration and recommendation prior to submission to the board of directors for those matters which require board action." **SUMF ¶ 9.**

It is irrefutable that TAC never had the opportunity to consider "all items within [its] scope of authority" on September 18, 2019, when it made its recommendation. Holding a second TAC hearing was intended to be an efficient way to resolve these inconsistencies and fill in the missing information. **SUMF ¶ 30-32, 34-35, 39-40.** Because Plaintiff cannot show that the Defendants gave more favorable treatment to another identical or directly comparable applicant by allowing them to flagrantly change the information contained in their application after TAC's recommendation and before City Board consideration, his Equal Protection claim fails.

**iii. Plaintiff cannot point to a similarly situated comparator that was not required to apply for and receive a Sightseeing permit under Article II of the City's Transportation Code.**

When submitting his initial application, the applicants selected "Specialty Transit" but put a question mark beside "Sightseeing." **SUMF ¶ 4.** Although his Business Tax application went to a separate City Department, he wrote "Sightseeing tours" on that application, as well. **SUMF ¶ 5.** Despite this evidence, Plaintiff insists that he was never confused as to the classification of the vehicle, and that he always wanted a Specialty Transit franchise and not a Sightseeing permit. Even if this were true, it is not a material

fact, and Plaintiff cannot point to any similarly difficult-to-classify motor vehicle that Defendants treated more favorably. In her deposition, Ms. Morrissey testified that it is common for applicants to not know which category was correct for their business, but the appropriate category "becomes clear as [the applicants and City staff] work through exactly what [the applicants] want to do, exactly what they have, and exactly how they want to operate." **SUMF ¶ 6-7.**

Further, Plaintiff never received, nor was he required to obtain, a dual classification as he concludes. **SUMF ¶ 34-35.** The source of this allegation comes from a single email sent to Plaintiff regarding his amended application in which Ms. Morrissey states, "The purpose of this hearing is to consider a request from Ms. Mary Verrinder and Mr. David Syndor [sic] d/b/a/ Greenway Tours/Yellow Submarine for a Specialty Transportation Permit or Sightseeing Permit to operate one fifteen-passenger peddle [sic] pub style electric bike." *Id.* This is not evidence of dual classification; it only shows the Defendants' constant attempt to ascertain which single classification was proper under the City Code, despite being given inconsistent, complete information. For these reasons, Plaintiff's Equal Protection claim fails.

**iv. Plaintiff's vehicle inspection was not altered in any way, and he can point to no individual or entity that received more favorable treatment.**

Plaintiff contends, without any evidence whatsoever, that he was treated less favorably because his vehicle inspection was amended "from pass to fail after the fact." ECF Doc. 3, ¶ 42(e); see also, ECF Doc. 32, at 3(D). It is undisputed that Sgt. Stockwell had safety concerns with the proposed route following the May 2020 inspection, and he communicated his initial concerns to Plaintiff. **SUMF ¶ 26-27.** Primarily, Sgt. Stockwell

was concerned with the width of the vehicle, as he knew that Plaintiff intended to travel on Central Avenue, and Central Avenue had lanes that were likely too narrow to allow for a motor vehicle to pass Bubbles safely. *Id.* Despite the lingering safety concerns, the inspection was never amended from passing to failing. Instead, Sgt. Stockwell left a comment on the inspection form: "Concern bike is too wide for vehicles to pass safely on Central. Vehicles have to be 3 feet from bike to pass." *Id.*

On July 6, 2020, Ms. Morrissey received the completed inspection form as part of the packet of new information from Plaintiff. **SUMF ¶ 29.** To prevent questions that might come before the City Board or the TAC, Ms. Morrissey reached out to Sgt. Stockwell for clarification regarding his comments. **SUMF ¶ 32.** When asked directly about his concerns, Sgt. Stockwell detailed his safety concerns related to the size, speed, and seating configuration of the vehicle. **SUMF ¶ 33.** Notably, these safety concerns echo those that ARDOT sent to Ms. Verrinder on November 13, 2019. **SUMF ¶ 24.** Moreover, there is no identical or directly comparable vehicle to Bubbles. Sgt. Stockwell testified that Bubbles was a unique vehicle, and it was the first time that he had performed an initial exam for a permit applicant; thus, he could not have treated Plaintiff differently than any other individual or entity. **SUMF ¶ 26.** For all these reasons, Plaintiff's Equal Protection claim fails.

**b. Even if Plaintiff could establish any less favorable treatment, all the Defendants' actions were rationally related to following the City's Code requirements and protecting the public safety and welfare.**

Assuming *arguendo* that Plaintiff could show less-favorable treatment than any similarly situated individual or entity, every alleged difference in treatment had a rational basis. *See Brandt by & through Brandt v. Griffin*, 147 F.4th 867, 882 (8th Cir.

2025). As explained above, it is undisputed that there was requisite information that was missing from Plaintiff's application after the first TAC meeting in September 2019 and that was not provided to the City until July 2020. **SUMF ¶ 8-19, 21, 4, 29, 33, 35, 38-39.** When Plaintiff finally submitted some of this information, it was inconsistent with much of the initial application that was presented to TAC, requiring a second TAC meeting to clear up the inconsistencies in his application and fill in the missing information. *Id.* The City's actions were also based on legitimate safety and traffic flow concerns and are thus not irrational as to offend the Equal Protection Clause. Passengers aboard Bubbles sit with backs exposed to traffic at side mirror height, and its top speed is 15.5 miles per hour. **SUMF ¶ 1-2.** Because any differences in treatment are rationally related to the City's legitimate interest in public safety and welfare, Plaintiff's Equal Protection claim fails.

**c. The analysis of Plaintiff's federal constitutional claims under § 1983 is equally applicable to his state constitutional claims under the ACRA. Thus, his ACRA claims must fail.**

The ACRA prohibits persons, acting under color of state law, from depriving any person of any rights, privileges, or immunities secured by the Arkansas Constitution. Ark. Code Ann. § 16-123-105; see also, *West v. Atkins*, 487 U.S. 42 (1988). The ACRA expressly requires that courts look to federal civil rights law for guidance. *See Island v. Buena Vista Resort*, 103 S.W.3d 671, 675–676 (Ark. 2003). Pursuant to ACRA, Plaintiff asserts that Defendants violated his equal protection and due process rights under the Arkansas Constitution, Article II, §§ 2-3.[5] ECF Doc. 3, at 11. Because the analysis of

[5] Ark. Const. art. II, § 8, appearing only in a heading in Plaintiff's Complaint, relates only to criminal issues and is wholly inapplicable to the civil context, as here.

Plaintiff's federal constitutional claims is equally applicable to his state constitutional claims, Plaintiff's ACRA claims fail for the same reasons mentioned above.

## III. Defendants are entitled to qualified immunity in their individual capacities.

Section 1983 provides a cause of action against any person who, acting under color of state law, deprives a plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Government officials sued in their individual capacities may assert qualified immunity, which shields them from liability unless their conduct violated a clearly established constitutional or statutory right of which a reasonable officer would have known. *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Arkansas courts apply the same qualified-immunity framework to ACRA claims that federal courts apply to § 1983 claims. *Sullivan v. Coney,* 2013 Ark. 222, at *6, 427 S.W.3d 682, 685-686 (2013) (internal citation and quotation omitted).

Courts apply a two-step inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id*. The plaintiff bears the burden of proving both prongs to defeat qualified immunity, and courts may address them in either order. *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015). The clearly established inquiry "must be undertaken in light of the specific context of the case, not a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also*, *District of Columbia v. Wesby,* 538 U.S. 48, 63-64 (2018); *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015).

A right is clearly established only if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11-14 (2015). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs,* 476 U.S. 335, 341 (1986)). While a case directly on point is not required, existing precedent must place the constitutional question "beyond debate." *al-Kidd,* 563 U.S. at 742 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). In other words, Plaintiff "must identify a case that puts [each Defendant] on notice that [his or her] specific conduct was unlawful," which he cannot do. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021).

For individual liability to attach, there must be a causal link between the individual's actions and the violation of a person's constitutional rights. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted). Very few cases address a city's denial of a discretionary permit, and to Defendants' knowledge, there is no binding authority decided on or before July 24, 2020, in which a municipal employee has violated the Fourteenth Amendment by requiring an applicant to abide by all state and federal laws or requiring a second advisory committee meeting once the application information changed significantly. To the extent any persuasive authority on these matters exists, it favors Defendants' position.[6] Because

[6] *See, e.g. Perkins v. City of St. Paul,* 982 F. Supp. 652, 658-59 (D. Minn. 1997) (City could deny business license without hearing because plaintiff had no property interest); *Minneapolis Auto Parts Co. v. City of Minneapolis*, 572 F. Supp. 389, 395 (D. Minn. 1983) (denial of permit and license was not a deprivation of property or liberty interest); *Klingner v. City of Braham*, 130 F. Supp. 2d 1068 (D. Minn. 2001) (no due process or equal protection violation when city discussed potential code violations but

Plaintiff cannot show that Defendants violated a clearly established right under the particular circumstances they faced, the Defendants are entitled to qualified immunity in their individual capacities.

### IV. Defendants are entitled to tort immunity from Plaintiff's gross negligence claim.

Ark. Code Ann. § 21-9-301 provides tort immunity to municipalities and their employees for alleged negligence, gross negligence, and reckless indifference committed during the performance of their official duties except to the extent the city has liability coverage. *Smith v. Brt*, 363 Ark. 126, 130, 211 S.W.3d 485, 489 (2005); see also, *City of Highfill v. Scantlin*, 2025 Ark. App. 242, at *5, 713 S.W.3d 501, 506 (2025); *Sledge v. City of Pine Bluff*, 2022 Ark. App. 23, at *7 (2022). A mayor's testimony is sufficient proof to establish that a city does not have insurance coverage. *Sledge*, 2022 Ark. App. at 8 (citing *City of Malvern v. Jenkins*, 2013 Ark. 24, at 9, 425 S.W.3d 711, 717).

Assuming without conceding that any tortious conduct occurred at all in this situation, Plaintiff cannot show that any Defendant acted with the requisite intent to survive statutory immunity under Ark. Code. Ann. § 21-9-301. True enough, Plaintiff asks that intent be inferred from the fact that Defendants allegedly breached their duties. ECF Doc. 3, ¶ 55. However, this is not sufficient under Arkansas's fact-pleading standard; Plaintiff must instead plead facts to show the commission of a "deliberate, knowing tort."

---

took no further action); *Scott v. Dep't of Pub. Safety Excise Div.*, 792 F. Supp. 666, 669 (E.D. Mo. 1992) (plaintiff's failure to supply documents precluded the creation of a protectable property interest); *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1016-1017 (8th Cir. 1983) (no due process violation because private ambulance company had no legitimate claim of entitlement to municipal license); *Solum v. Bd. of Cnty. Comm'rs for Cnty. of Houston*, 880 F. Supp. 2d 1008 (D. Minn. 2012) (no procedural due process violation when county employees did not forward deficient variance request to board of adjustment); *Palmore v. City of Pacific*, 851 F. Supp. 2d 1162 (E.D. Mo. 2010) (no due process or equal protection violation when city employees required plaintiff to follow municipal procedures when accessing cemetery and records).

*See Highfill*, 2025 Ark. App. 242, at *6, 713 S.W.3d at 507. Because Plaintiff has not pled such conduct and only alleges gross negligence, and the City does not have liability insurance [**SUMF ¶ 42]**, Plaintiff's gross negligence claim must be dismissed.

**V. Plaintiff has not alleged a City policy or custom that was the moving force behind his alleged violations; thus, his claim against the City fails.**

Claims against individuals in their official capacities are equivalent to claims against the entity in which they work for, in this case, the City of Hot Springs. *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Thus, Plaintiff's claims against the Defendants, in their official capacity, are redundant and should be dismissed as a matter of law because Plaintiff also named the City as a Defendant. Further, municipal liability under Section 1983 is severely limited. *Monell v. Dep't of Soc. Servs.,*436 U.S. 658, 694 (1978). A municipality cannot be held vicariously liable under § 1983 for its employees' unconstitutional acts. *Id*. at 691. To establish city liability, Plaintiff must show that his constitutional rights have been violated pursuant to an official City policy or a custom with the force of law. *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013).

A "policy" is an official policy, "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id*. A policy which does not "affirmatively sanction" unconstitutional action, and which instead relies on the discretion of the municipality's employees, is not an unconstitutional policy. *Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009); *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008); *Dick v. Watonwan County*, 738 F.2d 939, 943 (8th Cir. 1984). To establish a custom, a plaintiff must prove (1) the existence of a continuing, widespread persistent pattern of unconstitutional misconduct by

City employees; (2) deliberate indifference to or tacit authorization of such misconduct by the governmental entity's policymaking officials after notice of the misconduct; and (3) the custom was the moving force behind the constitutional violation. *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999). Here, Plaintiff's claims are based on the handling of his individual permit application, not on any policy, custom, or widespread practice. Additionally, there is no evidence that the City Board made a decision that caused Plaintiff's alleged injury. For these reasons, the City is entitled to summary judgment.

**CONCLUSION**

For all the reasons stated herein, Defendants are entitled to summary judgment, tort immunity, and qualified immunity in their individual capacity.

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Summary Judgment, dismiss Plaintiff's Complaint with prejudice, and grant Defendants any and all other just and proper relief to which they may be entitled.

Respectfully submitted,

**DEFENDANTS**

By: Gabrielle Gibson, Bar No. 2018113
301 W. 2nd St.
North Little Rock, AR 72115
Tel 501-537-3783
Fax: 501-537-7258
Email: ggibson@arml.org