**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**DAVID SYDNOR** **PLAINTIFF**

**v.** **CASE NO. 6:23-CV-6081-SOH**

**CITY OF HOT SPRINGS,**
**ARKANSAS, et al** **DEFENDANTS**

# DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

COME NOW Defendants, Harmony Morrissey, Sgt. James Eric Stockwell, and Lana Kelly, each in their individual and official capacities, and the City of Hot Springs, Arkansas, by and through undersigned counsel, Gabrielle Gibson, and for Defendants' Statement of Undisputed Material Facts, states as follows:

1. On July 1, 2019, Plaintiff David Sydnor ("Plaintiff") purchased an electric pedal pub, now known as Bubbles, with the intention of providing customers with a "natural way to see the Natural State." The Wire Transfer describes Bubbles as "16 SEATS LUXURY BEER BIKE/SITE SEEING[.]" **Exhibit 1, Wire Transfer Authorization; Exhibit 2, Deposition of David Sydnor, 128:20-22; Exhibit 3, Deposition of Lana Kelly, 29:6-24; Exhibit 4, Permit Application, p. 5.**

2. Bubbles was shipped from China and delivered to Plaintiff and Ms. Mary Verrinder ("Ms. Verrinder") in early October 2019. In shipping documents from Globalcare Logistics, the "Commodity" is listed as "LUXURY BEER BIKE" with a width of 79 inches, more than 6.5 feet, and a weight of 2425 pounds, or 1.1 metric tons. **Exhibit 5, Cargo Pickup and Delivery Order; Exhibit 6, Globalcare Logistics Shipping Docs.**

3. Bubbles has four wheels and a 3500-watt electric motor. Passengers sit with their backs exposed to the road around motor vehicle side mirror height. **Exhibit 7, Bubbles Plaque; Exhibit 8, Photograph of Bubbles.**

4. On August 20, 2019, Ms. Verrinder submitted a transportation permit application, on behalf of herself and Plaintiff David Sydnor, to Defendant Lana Kelly ("Defendant Kelly"), the office manager for the City's Intracity Transit Office. Ms. Verrinder and Plaintiff sought to operate Bubbles under the proposed company name of "Greenway Tours/Yellow Submarine." The application has a checkmark by specialty transit, and Ms. Verrinder put a question mark by sightseeing. **Exhibit 4; Exhibit 9, Deposition of Harmony Morrissey, 13:9-14:4; Exhibit 3, 12:16-13:5, 29:17-30:6; Exhibit 2, 32:23-24.**

5. Ms. Verrinder and Plaintiff also submitted a business occupation tax application for Greenway Tours/Yellow Submarine to the City's Finance Department. The original business occupation tax application describes the business as "sightseeing tours." On the amended business tax application, "sightseeing tours" is replaced with "specialty vehicle." **Exhibit 10, Business Tax Application; Exhibit 11, Amended Business Tax Application; Exhibit 9, 15:6-16:3.**

6. When an applicant submits a transportation permit application, City staff work with the applicant to gather the necessary documents, pursuant to the City's Transportation Code, to ensure the permit is complete. The necessary documents depend on what kind of permit the applicant is applying for, and the applicant is not bound to the type of permit that he or she initially seeks. **Exhibit 9, 10:16-23; Exhibit 3, 10:20-25, 30:4-15.**

7. It is common for applicants to not know which permit classification is appropriate for their business. However, the classification "becomes clear as [the applicant and the City] work through exactly what [the applicants] want to do, exactly what they have, and exactly how they want to operate." A lot of changes can happen after the beginning of the process. **Exhibit 9, 77:10-78:12; Exhibit 3, 30:12-15.**

8. In 2019, Defendant Kelly would work with the applicant to ensure all the required documentation and information was submitted with the application. Once the applicant submitted all the necessary documentation and information, Defendant Kelly would schedule a Transportation Advisory Committee ("TAC") meeting, which are scheduled on an as-needed basis. The requisite documentation and information depended on what type of permit the applicant sought. **Exhibit 3, 8:14-18, 10:16-25.**

9. The City Code requires that "all items within the scope of authority of any advisory committee be submitted to said advisory committee for consideration and recommendation prior to submission to the board of directors for those matters which require board action except in the case of emergency matters[.]" **Exhibit 12, Relevant City Code, § 2-8-30(2)(h).**

10. The TAC reviews all information submitted in a packet concerning a transportation permit application. It can recommend the approval of a transportation permit to the Hot Springs Board of Directors ("City Board"), but it does not have authority to approve any transportation permits. **Exhibit 13, Declaration of LeDante Walker ¶ 3-4; Exhibit 9, 20:23-21:9.**

11. The City Board has the sole authority to approve or deny a transportation permit.**; Exhibit 13, ¶ 2-4; Exhibit 12, § 2-8-30(2)(h); Exhibit 9, 80:1-6.**

12. If the TAC reviews a complete application and votes to recommend approval for a transportation permit to the City Board, the complete application packet would be sent to the City Clerk's Office to be reviewed and put together in the City Board. **Exhibit 9, 22:17-23.**

13. Defendant Kelly scheduled a TAC meeting for September 18, 2019, to discuss Plaintiff and Ms. Verrinder's application. She provided every committee member with a packet of all the information provided. The TAC considered Plaintiff's two proposed routes, the Downtown route and the Greenway route, that Plaintiff and Ms. Verrinder submitted with their transportation permit application. The Downtown route went through the City's downtown area, specifically Central Avenue. The Greenway route made use of the Greenway, which is part of the City's Trail system. **Exhibit 14, 9.18.19 TAC Meeting Minutes, p. 3; Exhibit 2, 73:6–11; Exhibit 13, ¶¶ 7-8; Exhibit 3, 10:9-15, 27:25-28:1; Exhibit 9, 21:11-22; Exhibit 15, September 18, 2019, TAC Packet.**

14. Because Bubbles was still being shipped from China and was not in Plaintiff's or Ms. Verrinder's physical custody, the TAC could not yet consider the actual vehicle. However, Plaintiff and Ms. Verrinder described the expected physical description of Bubbles as "about 6 feet wide," with 10 seats that each had pedals, a bench seat in the back, and a small engine to assist the passengers when necessary. **Exhibit 14, p. 3; Exhibit 2, 73:6–11; Exhibit 13, ¶¶ 7-8; Exhibit 15.**

15. During the September 18, 2019, TAC meeting, the TAC members were concerned about the vehicle's use of the Greenway. The Director of Parks and Trails

stated that he would address the concerns with the Parks and Trails Advisory Committee ("PTAC") at their meeting. **Exhibit 14.**

16. By the end of the meeting, the TAC voted to recommend approval of the Downtown route. The subject of the TAC's vote was limited to the proposed routes because the TAC did not have all the requisite information for the application to be complete. **Exhibit 13, ¶ 7; Exhibit 15; Exhibit 14.**

17. On September 19, 2019, the PTAC unanimously denied recommending approval for the Greenway route. The PTAC felt that due to its size, Bubbles would deter regular users of the Greenway. Bubbles was described as having twelve (12) passenger seats and being "six-feet wide." The PTAC also discussed the length and steepness of the route and the likelihood that passengers would become tired and initiate the use of the small engine, which is prohibited on the Greenway. The PTAC noted that this type of venture often involves the use of alcohol, and alcohol is not permitted on the Greenway. **Exhibit 16, 9.19.19 PTAC Meeting Minutes; Exhibit 14, ¶ 7.**

18. Sometime after the TAC hearing on September 18, 2019, Plaintiff and Ms. Verrinder changed the company name from "Greenway Tours/Yellow Submarine" to only "Greenway Tours." **Exhibit 2, 57:4–9.**

19. On October 17, 2019, Defendant Kelly emailed Ms. Verrinder, requesting the following information that was missing from their application: (1) photographs of the vehicle; (2) final trade name of the vehicle under which the applicant proposes to operate; (3) fee schedule; (4) route of the vehicle; and (5) complete vehicle inspection. Plaintiff describes the missing information as "ridiculous," "all just minor details," or not a big

deal. **Exhibit 17, 10.17.19 Email from Kelly to Verrinder with List of Required Missing Information; Exhibit 2, 78:19-79:9, 82:20-21.**

20. On October 31, 2019, Officer Plyler and Officer W. Stockwell with the Hot Springs Police Department ("HSPD") performed a vehicle inspection of the pedal pub. Bubbles did not pass the inspection because it was missing a proper logo with the required three-inch lettering. **Exhibit 2, 54:19-55:12; Exhibit 18, HSPD Radio Logs, p. 1-2.**

21. On November 5, 2019, Ms. Verrinder acknowledged that all the paperwork had not been turned in, yet, and it is best to have all paperwork turned in before another meeting is scheduled. **Exhibit 19, 11.5.19 Email from Kelly to Verrinder, at 1.**

22. That same day, Defendant Kelly informed Ms. Verrinder via email that if she wished to make the City Board meeting on December 3, 2019, all the missing information would need to be provided by November 21, 2019, to get on the December 3rd agenda. Additionally, if their route was on a state highway, such as Central Avenue, the route would also need approval from the Arkansas Department of Transportation ("ARDOT"). Defendant Kelly informed Ms. Verrinder via telephone that another TAC meeting would be required before the December 3 City Board meeting. **Exhibit 19, at 1; Exhibit 3, 18:5-15, 19:14-22:2.**

23. Vehicles traveling on Central Avenue often encounter overlapping concurrent regulation by City, state, and federal government because Central Avenue is contiguous with Arkansas Highway 7 and adjacent to Hot Springs National Park. The City requires all permit holders to comply with state and federal law. The City requests that applicants check with the state to review bicycles, pedicabs, and horse drawn

carriages to prevent any potential future issues. The City does not want to issue a permit for a business the applicant cannot legally operate. **Exhibit 12, § 13-1-13(3)(a); Exhibit 9, 33:15-34:7, 35:14-36-12; Exhibit 2, 135:14-136:6.**

24. On or about November 7, 2019, Ms. Verrinder contacted ARDOT. She received an email from Mark Headley ("Mr. Headley") expressing specific safety concerns regarding the vehicle's ability to stay in the designated bike lanes or to be passed. Defendant Kelly was also made aware of ARDOT's safety concerns. **Exhibit 20, November 2019 Emails between Verrinder and ARDOT.**

25. On November 19, 2019, Ms. Verrinder informed Defendant Kelly via email that the new name is "Bubble Barge," and they are working on the logo. **Exhibit 21, 11.19.19 Email from Verrinder to Kelly; Exhibit 9, 33:10-12.**

26. On May 14, 2020, Plaintiff and Ms. Verrinder requested a second vehicle inspection. Defendant James Eric Stockwell ("Defendant Stockwell") performed this examination. The majority of Defendant Stockwell's inspections had been for renewals for permit holders. This was his first vehicle inspection for an initial permit applicant. Defendant Stockwell completed the Annual Vehicle Examination, noting the seating capacity, excluding the driver, was fifteen (15). After speaking with ARDOT, Defendant Stockwell believed Bubbles to be an electric bike. It did not pass the examination because it needed a plaque with the classification number, top speed, and wattage of the vehicle. **Exhibit 22, Email from Eric Stockwell to City Attorney; Exhibit 23, Annual Vehicle License 06.30.20; Exhibit 2, 92:3–5; Exhibit 24, Deposition of James Eric Stockwell, 13:4-14:25, 21:22-22:5, 34:25-35:3; Exhibit 18, p. 3.**

27. During this examination, Defendant Stockwell explained to Plaintiff and Ms. Verrinder that he had safety concerns regarding the proposed route along Central Avenue. Defendant Stockwell noted a safety concern on the examination section of the Annual Vehicle License Form. Primarily, Defendant Stockwell was concerned with the vehicle's width because Central Avenue had lanes that were too narrow to allow for a motor vehicle to pass Bubbles safely. **Exhibit 23; Exhibit 24, 13:24-14:10, 19:4-17, 25:10-22, 33:13-16.**

28. On June 30, 2020, Plaintiff and Ms. Verrinder requested a third vehicle examination. This examination was performed by Officer Sampson, who contacted Defendant Stockwell by phone and explained that Plaintiff added the necessary plaque to the vehicle. Defendant Stockwell informed Officer Sampson that the plaque was all that had been necessary to complete the examination. Officer Sampson signed off on the Annual Vehicle License Form. **Exhibit 22; Exhibit 2, 59:23–25; Exhibit 23; Exhibit 24, 17:10-13.**

29. On July 6, 2020, Plaintiff and Ms. Verrinder provided Defendant Harmony Morrissey ("Defendant Morrissey") with documentation to supplement their transportation permit application. Specifically, they provided the Annual Vehicle License Form, actual photographs of Bubbles, and four new tour routes. Two routes, the "Sgt. Stockwell Tour" and the "Sgt. Stockwell Park Plus Tour," were similar to the description of the previous Downtown route but without the block of the route that went onto Central Avenue. The "Little Falls Tour" and "Greenway Truck Route" contained portions of the Greenway, previously rejected by PTAC. On the annual vehicle inspection form, the seating capacity (excluding the driver) was listed at fifteen (15). Plaintiff also believed

that he had ARDOT approval. **Exhibit 2, 94:5-95:12, 97:19–98:4, 129:5-14; Exhibit 25, 7.6.20 Email From Morrissey to TAC Members; Exhibit 26, Four New Tour Routes; Exhibit 9, 52:21-23; Exhibit 27, 7.6.2020 Supplemental Application Information; Exhibit 2, 81:5-14; 86:14–24.**

30. Defendant Morrissey explained to Plaintiff and Ms. Verrinder that a second TAC hearing was needed to address the new information in their application. Defendant Morrissey emailed the new information regarding the amended application to City staff and TAC members. **Exhibit 2, 97:19–98:4; Exhibit 25.**

31. On July 7, 2020, Defendant Morrissey emailed Ms. Verrinder to inform her that her and Plaintiff's amended application had been sent to City staff and that a public hearing before TAC would be set. Plaintiff was not required to submit a new application or pay any additional application fee because they were not starting the process over. **Exhibit 28, Email from Morrissey to Verrinder and Kelly; Exhibit 2, 88:10-17; Exhibit 9, 91:4-17.**

32. On July 8, 2020, Defendant Morrissey emailed the amended application to Defendant Stockwell and the City's police chief to review and note any issues that should be addressed at or before the second TAC hearing. **Exhibit 29, Emails between Stockwell and Morrissey.**

33. On July 12, 2020, Defendant Stockwell explained in detail his safety concerns regarding the vehicle being on two-way streets, impeding traffic, and causing issues with the Fire Department responding to emergencies on Broadway Street. Defendant Stockwell's supervisor shared the same concern, stating: "We sent our concerns through to the City and we can express them again at the hearing. Ultimately,

the City has to decide if they are willing to accept the risk." **Exhibit 24, 28:24-29:3; Exhibit 9, 57:14-15; Exhibit 30, Lt. Roach's Email; Exhibit 24, 26:15.**

34. On July 15, 2020, Defendant Morrissey sent Plaintiff and Ms. Verrinder a letter informing them that a TAC hearing had been scheduled for July 24, 2020. In this letter, she referred to their permit application as "A Specialty Transportation Permit or Sightseeing Permit to operate one fifteen-passenger peddle [sic] pub style electric bike." Defendant Morrissey requested their attendance at the hearing to provide necessary information to move forward with their application. Under the Transportation Code, at any public hearing, the applicant "may present witnesses or other evidence, may be represented by an attorney and may cross-examine opposing witnesses." Plaintiff received this letter but did not respond. **Exhibit 31, 7.15.20 Letter from Morrissey to Verrinder and Plaintiff; Exhibit 2, 86:7-9, 111:9-112:16.; Exhibit 12, § 13-1-12.**

35. Throughout the transportation application process, Defendants were not certain whether the applicants were seeking a Sightseeing permit or a Specialty Transit permit because necessary information was missing from Plaintiff's application, and information was constantly changing. Annual vehicle inspections are required for both Sightseeing vehicles and Specialty Transit Services. **Exhibit 9, 38:3-39:3; Exhibit 12, § 13–1–3; Exhibit 32, Declaration of Harmony Morrissey, ¶ 7; Exhibit 24, 20:2-21:7.**

36. The Ducks and the Trolley are both classified as sightseeing vehicles. The Ducks must obtain approval from the United States Coast Guard, and the Trolley must obtain authorization from the National Park Service. While traveling on land, passengers sit in a semi-enclosed steel frame above the level of typical traffic. A Duck has a top speed on land of fifty miles per hour and also travels on water. Plaintiff contends that the Ducks

are most similar to Bubbles. Ex**hibit 33, Duck Photo in Traffic; Exhibit 9, 33:21-34:7; Exhibit 2, 122:15-124:18.**

37. JJ's Pedicabs and the Circle Double D Carriage Company ("horse carriages") are both classified as a Specialty Transit Service and possess a franchise agreement adopted by the City via Ordinance. Pedicabs are about five-foot wide bicycles that transport one or two people on small wheels and do not weigh more than one can lift. The carriages are operated, in part, by a horse and carry less passengers than Bubbles. The rickshaws never received a permit or franchise. **Exhibit 12, Relevant City Code § 13–1–3; Exhibit 9, 37:14-16, 82:13-16; Exhibit 2, 103:4-6; Exhibit 34, Photograph of Circle Double D. Carriage; Exhibit 2, 12:18-21, 46:6-14, 71:21-24, 145:19-20.**

38. On July 22, 2020, Plaintiff again changed the routes in which he was seeking a recommendation of approval. He also questioned why he should attend the second TAC hearing. **Exhibit 2, 107:7-14; Exhibit 35, 7.22.20 Emailed Letter from Plaintiff to Morrissey.**

39. As of July 23, 2020, the following items were missing from Plaintiff's application: (1) proof of payment of the premium of their insurance, (2) proof that the City was on the insurance, (3) their intended rates of pay, (4) their intended service hours, (5) place of business and how they plan to sell tickets without a storefront, (6) what areas they plan to load or unload in, (7) possible signage since they have no physical storefront, (8) their intended complaint process, and (9) the number of seats on their vehicle. The number of passenger seats determines the annual permit fee. However, Plaintiff reiterated his decision not to attend the second TAC hearing. **Exhibit 36, Email from Morrissey to City Attorney; Exhibit 9, 86:2-9; Exhibit 37, 7.23.20 Email from**

**Plaintiff and Verrinder to City Staff; Deposition of David Sydnor, 114:21-115:13; Exhibit 38, 7.23.20 City Attorney Albright Summary Email.**

40. On July 24, 2020, the TAC held a second hearing to discuss Plaintiff's permit application. The TAC members reviewed their packets and noted the applicants' absence and how much the application had changed since the first TAC hearing. Chairperson LeDante Walker testified that the TAC never had enough information to recommend approval for a permit and that the information provided to TAC changed significantly between September 18, 2019, and July 24, 2020. The TAC members also noted that despite Defendant Kelly reaching out to Plaintiff and Ms. Verrinder, they still had not completed the application. The TAC unanimously denied recommending approval of a permit based on the absence of the applicants, confusion over the name "Greenway Tours/Yellow Submarine," no clearly defined route, safety concerns with the route options that had been presented, and several application requirements as being incomplete. **Exhibit 39, 7.24.20 TAC Hearing Transcript, 15:20–18:3; Exhibit 13, ¶ 8, 10-12; Exhibit 40, July 24, 2020, TAC Packet.**

41. On July 27, 2020, Defendant Morrissey mailed Plaintiff and Ms. Verrinder a letter informing them of the TAC's decision. **Exhibit 41, Denial Letter from Morrissey to Plaintiff and Verrinder.**

42. The City does not maintain any policy of liability insurance that would provide any coverage in this case. **Exhibit 42, Affidavit of Bill Burrough.**

43. Plaintiff's application with the City remains open, and the Board has not rendered a final, administrative decision. However, Plaintiff is not "walking back in that snake pit." **Exhibit 9, 79:18-80:11; Exhibit 2, 146:3-147:4.**

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Summary Judgment, dismiss Plaintiff's Complaint with prejudice, and grant Defendants any and all other just and proper relief to which they may be entitled.

Respectfully submitted,

**DEFENDANTS**

By: Gabrielle Gibson, Bar No. 2018113
301 W. 2nd St.
North Little Rock, AR 72115
Tel 501-537-3783
Fax: 501-537-7258
Email: ggibson@arml.org