IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

DAVID SYDNOR PLAINTIFF

v. Case No. 6:23-cv-6081

CITY OF HOT SPRINGS, ARKANSAS;
HARMONEY MORRISEY, CITY CLERK,
Officially and Individually;
LT. JAMES ERIC STOCKWELL,
Officially and Individually;
LANA KELLY, INTRACITY TRANSIT
MANAGER, Officially and Individually DEFENDANTS

# MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed by Defendants. ECF No. 40. Plaintiff has responded. ECF No.47. Defendants have filed a reply. ECF No. 53. The Court finds the matter ripe for consideration.

## I. BACKGROUND

The following facts are either uncontested or viewed in the light most favorable to Plaintiff.[1] In July 2019, Plaintiff David Sydnor purchased an electric pedal pub, known as "Bubbles," with the intention of providing customers in Hot Springs, Arkansas, with a tour of the area. In a wire transfer document, Bubbles is referred to as "16 SEATS/LUXURY BEER BIKE/SITE SEEING." ECF No. 42-1. Bubbles was delivered to Plaintiff and Mary Verrinder in early October 2019. In shipping documents, Bubbles is described as "LUXURY BEER BIKE" with a width of 79 inches and weight of 2,425 pounds. ECF No. 42-5. Bubbles has four wheels

[1]The Court's Local Rules require the non-moving party to file a "separate, short and concise statement of the material facts as to which it contends a genuine dispute exists to be tried." Local Rule 56.1. Plaintiff did not do so. Instead, Plaintiff filed a Statement of Facts. The Court has attempted to ascertain which, if any, material facts are in dispute, but Plaintiff has not specifically identified for the Court which facts he contends are in dispute.

and a 3,500-watt electric motor. Most of the passengers would sit at one of two bars located on Bubbles with their backs to the road. ECF No. 42-8. These seats around the bar appear to have pedals beneath them for passengers. ECF No. 42-8.

On August 20, 2019, Ms. Verrinder submitted a transportation permit application on behalf of herself and Plaintiff. She submitted the application to Lana Kelly ("Defendant Kelly"), the office manager for the Intracity Transit Office of Hot Springs, Arkansas ("City"). Ms. Verrinder and Plaintiff sought to operate Bubbles under the proposed company name of "Greenway Tours/Yellow Submarine." ECF No. 42-4. The application has a circle for applicants to check to indicate the type of permit they are seeking. ECF No. 42-4. The application at issue has a checkmark beside a box labeled "Specialty Transit (ST)" and a question mark beside the circle labeled "Sightseeing Service (SS)." ECF No. 42-4. Ms. Verrinder and Defendant also submitted a business occupation tax application for Greenway Tours/Yellow Submarine to the City's Finance Department, which describes the business as "sightseeing tours." ECF No. 42-10. The application was later amended, and "sightseeing tours" is crossed out and replaced with "specialty vehicle (pedal carriage)."

When an applicant submits a transportation permit application, City staff work with the applicant to gather the necessary documents required by the City's Transportation Code ("Code") to ensure that the permit application is complete. The necessary documents depend on what type of permit the applicant is seeking, and the applicant is not bound to the type of permit that he or she initially seeks. According to Harmony Morrisey ("Defendant Morrisey"), the City Clerk for Hot Springs, applicants do not always know which type of transportation permit is appropriate for their business, but it would become clearer as the applicant and City worked through the permit

process. ECF No. 42-9, p. 20.[2]

In 2019, Defendant Kelly would work with the applicants to ensure that all required documents and information were submitted with the application. Once an applicant has submitted all necessary documents and information, Defendant Kelly would schedule a Transportation Advisory Committee ("TAC") meeting, which would be scheduled on an as-needed basis. The TAC considers all matters referred and submits a recommendation to the Hot Springs Board of Directors ("City Board"). ECF No. 42-13, ¶ 2. These recommendations are advisory for final consideration by the Board. ECF No. 42-13, ¶ 3.

The Code requires that "all items within the scope of authority of any advisory committee be submitted to said advisory committee for consideration and recommendation prior to submission to the board of directors for those matters which require board action except in the case of emergency matters." ECF No. 42-12, p. 40. (Code Section 2-8-30). The TAC reviews all information submitted in the application packet. The TAC can recommend the approval of a transportation permit to the City Board, but the TAC does not have authority to approve any transportation permits. ECF No. 42-13, ¶ 4. The authority to approve transportation permits rests solely with the City Board.

Defendant Kelly scheduled a TAC meeting for September 18, 2019, to discuss Plaintiff and Ms. Verrinder's transportation permit application. Because Bubbles was in the process of being shipped from China, the TAC could not consider the actual vehicle. The TAC was given a description of Bubbles and a manufacturer rendering of a similar vehicle. The TAC considered two proposed routes for Bubbles, the downtown route and the Greenway route. The downtown route went through Hot Springs's downtown area and included Central Avenue. The Greenway

[2]In this opinion, the page numbers refer to the ECF page numbers of the exhibit.

route made use of the Greenway, which is part of Hot Springs's trail system. Plaintiff presented the routes verbally at the meeting. TAC members voiced concerns about Bubbles's use of the Greenway, and the Director of Parks and Trails indicated that he would address the concerns with the Parks and Trails Advisory Committee ("PTAC"). At the end of the TAC meeting, the TAC voted to recommend approval of the downtown route but denied approval for the Greenway route.

The parties disagree as to the specifics of the TAC approval. According to LeDante Walker, TAC Chairperson, the subject of the vote was limited to the routes being proposed. He declares that there was no vote regarding a recommendation of approval for a permit, because the TAC did not have all the requisite application information. ECF No. 42-13, ¶ 8. On the other hand, the September 18, 2019 TAC meeting minutes state that a motion was made "to approve the recommendation to the Hot Springs Board of Directors for approval of the permit for Greenway Tours/Yellow Submarine Tours for the downtown portion of their tour pending the outcome of the Parks and Trails Committee ruling on the Greenway portion." ECF No. 42-14, p. 3. The minutes further state, "[u]pon voice vote motion unanimously carried." ECF No. 42-14, p. 3. Plaintiffs interpret the meeting minutes to note that the "TAC voted unanimously in favor of making a recommendation for approval to the [City Board]." ECF No. 48, ¶ 7. It appears that Plaintiff understood the minutes to state that the TAC voted to recommend to the Board approval of the transportation *permit* as it related to the downtown route, not just approval of the route. For purposes of deciding the instant summary judgment motion, the Court will assume Plaintiff's interpretation as true.

According to Plaintiff, based on the TAC "recommendation for approval," Plaintiff built a garage to house Bubbles and serve as the business's base of operations. ECF No. 48-9, ¶ 6. Plaintiff claims that he has paid a total of $80,000.00 related to Bubbles, the garage, and the

application process. At some point after the September 18, 2019 TAC meeting, Plaintiff and Ms. Verrinder changed their company name from "Greenway Tours/Yellow Submarine" to "Greenway Tours." ECF No. 42-2, p. 15.

On September 19, 2019, the PTAC denied recommending approval for the Greenway route for several reasons, which included the size of Bubbles, the length and steepness of the route, and the likelihood that passengers would become tired and initiate the use of the electric motor, which was prohibited on the Greenway.

On October 17, 2019, Defendant Kelly emailed Ms. Verrinder requesting that she provide information that was needed "to finish up your permit." ECF No. 17. The missing information included photos of Bubbles, the new name of the vehicle, fee schedule, map of Bubbles's route, and annual vehicle license. ECF No. 17. Ms. Verrinder acknowledged that it would be best to have all "paperwork" turned in before another City Board meeting was scheduled. ECF No. 17.

On October 31, 2019, Officer Plyler and Officer W. Stockwell[3] with the Hot Springs Police Department performed a vehicle inspection of Bubbles. ECF No. 42-18. Bubbles did not pass inspection because it was missing a proper logo with the required three-inch lettering.

On November 5, 2019, Defendant Kelly informed Ms. Verrinder via email that if she wished to appear before the City Board at the December 3, 2019 meeting, all missing application information would need to be provided by November 21, 2019. ECF No. 42-19. Defendant Kelly also informed Ms. Verrinder that, if Bubbles's route was on a state highway, such as Central Avenue, the route would need approval from the Arkansas Department of Transportation ("ARDOT"). ECF No. 42-19.

Vehicles traveling on Central Avenue can encounter overlapping concurrent regulation by

---

[3]The Court notes that it appears Officer W. Stockwell and Defendant Lieutenant James Eric Stockwell are different officers with the Hot Springs Police Department.

city, state, and federal government because Central Avenue is contiguous with Arkansas Highway 7 and adjacent to Hot Springs National Park. Hot Springs requires all permit holders to comply with state and federal law and requests that transportation permit applicants check with the state to review bicycles, pedicabs, and horsedrawn carriages to prevent potential issues. ECF No. 42-12 (Code Section 13-1-13(a)). Hot Springs does not want to issue a transportation permit to a business that could not legally operate within Hot Springs. ECF No. 42-9, p. 9.

On November 7, 2019, Ms. Verrinder contacted ARDOT regarding Bubbles. She received an email from Mark Headley, an ARDOT engineer, expressing safety concerns regarding Bubbles's ability to stay in the designated bike lanes or to be passed by other vehicles. ECF No. 42-20. Defendant Kelly was made aware of ARDOT's safety concerns. Mr. Headley informed Ms. Verrinder via email that he did not have "the authority to approve a vehicle's use of a highway." ECF No. 48-14, p. 2. He stated that if Bubbles "was a vehicle that can legally be on a roadway in the state then it should be allowed on Hwy. 7." ECF No. 48-14.

On May 14, 2020, Plaintiff and Ms. Verrinder requested a second vehicle inspection. Lieutenant James Stockwell ("Defendant Stockwell") of the Hot Springs Police Department performed the examination. After speaking with ARDOT, Defendant Stockwell believed Bubbles to be an electric bicycle. Bubbles did not pass inspection because it needed a plaque with the classification number, top speed, and wattage of the vehicle. Defendant Stockwell noted his concern with the vehicle's width not allowing other vehicles to pass safely. ECF No. 42-23.

On June 30, 2020, Plaintiff and Ms. Verrinder requested a third vehicle inspection, which was performed by Officer Sampson with the Hot Springs Police Department. Officer Sampson contacted Defendant Stockwell by phone and explained that Plaintiff had added the plaque to Bubbles, and Defendant Stockwell informed Officer Sampson that the plaque was all that Plaintiff

lacked to complete the inspection. ECF No. 42-22. Officer Sampson then signed off on the Annual Vehicle License Form. ECF No. 42-22.

On July 6, 2020, Plaintiff and Ms. Verrinder provided Defendant Morrisey with documentation to supplement their transportation permit application. They provided the Annual Vehicle License Form, photos of Bubbles, and four proposed tour routes. Two routes, the "Sgt. Stockwell Tour" and the "Sgt. Stockwell Plus Tour," were similar to the description of the previous downtown route but left off the block of the route that went onto Central Avenue. ECF No. 42-26. The "Little Falls Tour" and "Greenway Truck Route" contained portions of the Greenway that were previously rejected by PTAC. ECF No. 42-26. Defendant Morrissey explained to Plaintiff and Ms. Verrinder that a second TAC hearing was needed to address the new information in their application. Defendant Morrisey emailed the new information, which she referred to as an "amended application," to other city employees and TAC members. ECF No. 42-25. On July 7, 2020, Defendant Morrisey informed Ms. Verrinder via email that a public hearing before TAC would be scheduled. ECF No. 42-28.

On July 8, 2020, Defendant Morrisey emailed the new information to Defendant Stockwell and the police chief to review and note any potential issues that should be addressed at the TAC meeting. ECF No. 42-9. On July 12, 2020, Defendant Stockwell emailed his safety concerns regarding Bubbles, which included Bubbles being on two-way streets, impeding traffic, and causing issues with the Fire Department responding to emergencies on Broadway Street. ECF No. 42-29. Defendant Stockwell's supervisor, Lieutenant Shaun Roach, also had similar safety concerns. ECF No. 42-30.

On July 15, 2020, Defendant Morrisey sent Plaintiff and Ms. Verrinder a letter informing them that a TAC meeting had been scheduled for July 24, 2020. Defendant Morrisey referred to

the permit application as a "Specialty Transportation Permit or Sightseeing Permit to operate one fifteen-passenger peddle [sic] pub style electric bike." ECF No. 42-31. Defendants were uncertain throughout the application process whether Plaintiff and Ms. Verrinder were seeking a sightseeing permit or a specialty transit permit. ECF No. 42-9, p. 10; ECF No. 42-32, ¶ 6. Hot Springs does not allow a vehicle to operate pursuant to more than one permit of any type. ECF No. 48-3, p. 10 (Code Section 13-1-14(7)). Defendant Morrisey requested Plaintiff's and Ms. Verrinder's attendance at the meeting to provide the necessary information to move forward with their transportation permit application. ECF No. 42-31.

On July 22, 2020, Plaintiff wrote a note to Defendant Morrisey, in which he stated that "we're only presenting our pre-approved Downtown tour to the [Board]. No others should be considered by anyone." ECF No. 42-35, p. 2. He also questioned why he should attend the second TAC meeting when one of the routes had already been recommended for approval by TAC. ECF No. 42-35.

As of July 23, 2020, the following items were missing from Plaintiff's application: (1) proof of payment of their insurance premium; (2) proof that Hot Springs was on the insurance; (3) the intended rates of pay; (4) the intended service hours; (5) place of business and how tickets would be sold without having a storefront; (6) what areas passengers would load and unload; (7) possible signage because there is no physical storefront; (8) the intended complaint process; and (9) the number of seats on Bubbles. ECF No. 42-36.

On July 24, 2020, the TAC held a second hearing to discuss Plaintiff's permit application. The TAC members noted Plaintiff's and Ms. Verrinder's absence and the changes to the application since the previous TAC meeting regarding Bubbles. Mr. Walker, TAC Chairperson, testified at the meeting that the TAC never had enough information to recommend approval for a permit and that

the information provided to TAC changed significantly between September 18, 2019, and July 24, 2020. The TAC members also noted that the application remained incomplete. The TAC unanimously voted to deny recommending approval of a permit based on the absence of the applicants, confusion over the name "Greenway Tours/Yellow Submarine," no clearly defined route, safety concerns with the proposed routes, and several incomplete application requirements. ECF No. 42-39, pp. 15-18. According to Defendants, Plaintiff's transportation permit application remains open, and the Board has not issued a final administrative decision. Plaintiff believes that Defendants sabotaged his efforts to obtain a permit because they did not like him. ECF No. 48-9, p. 6.; ECF No. 9-22.

On July 6, 2023, Plaintiff filed his complaint asserting, pursuant to 42 U.S.C. § 1983, a Fourteenth Amendment equal protection claim and due process claims. He also asserts parallel Arkansas constitutional claims under the Arkansas Civil Rights Act ("ACRA") and a state law gross negligence claim. Plaintiff sues all Defendants in their individual and official capacities. Defendants argue that they are entitled to summary judgment on all claims. ECF No. 3.

## II. STANDARD OF REVIEW

The standard for summary judgment is well established. When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution affects the outcome of the case under the governing law.

*Id*. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving part's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007).

## III. DISCUSSION

The Court will first consider each of Plaintiff's 42 U.S.C. § 1983 constitutional claims. The Court will then consider the parallel state constitutional claims under ACRA. Lastly, the Court will discuss Plaintiff's state law gross negligence claim.

### A. Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. This clause embodies both procedural due process components and substantive due process components. *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). "'Analysis of

either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated,' *Dover v. Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 445-56 (8th Cir. 1995), and '[t]he possession of a protected life, liberty, or property interest is . . . a condition precedent' to any due process claim." *Singleton*, 176 F.3d at 424 (quoting *Movers Warehouse, Inc. v. City of Little Canada*, 71 F.3d 716, 718 (8th Cir. 1995)). "[W]here no such interest exists, there can be no due process violation." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997).

**1. Procedural Due Process Claim**

To prevail on his procedural due process claim, Plaintiff must establish that: (1) Defendants deprived him of a property interest protected by the Fourteenth Amendment; and (2) he was deprived of that property interest without adequate process. *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 902 (8th Cir. 2000). Thus, the Court first must determine whether Plaintiff possessed a protectible property interest in obtaining a transportation permit from the City. Property interests are created not by the Constitution but from an independent source of state law. *See Mover's Warehouse*, 71 F.3d at 718. The property interest claimed by Plaintiff derives from the licensing scheme set forth in the City's Code. *See id.* at 718, n. 3. (recognizing that a municipal ordinance can be a form of state law creating a protected property interest). To establish a property interest in obtaining a transportation permit, Plaintiff "must show more than a unilateral expectation" of obtaining a transportation permit. *See Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir. 2000) (citing *Mover's Warehouse*, 71 F.3d at 718). Plaintiff "must possess a legitimate claim of entitlement to" obtaining a permit. *Id.* (citing *Mover's Warehouse*, 71 F.3d at 718).

"One manner in which state law can create a property interest is by establishing procedural requirements that impose substantive limitations on the exercise of official discretion." *Id.* (citing *Mover's Warehouse*, 71 F.3d at 718). A plaintiff must show that the relevant statute or ordinance

"does not leave 'considerable discretion' in the hands of [the decisionmaker]." *McGuire v. Indep. Sch. Dist. No. 833*, 863 F.3d 1030, 1035 (8th Cir. 2017) (quoting *Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385, 391 (8th Cir. 1986)). If no set of facts would compel the issuance of the benefit, there is no "legitimate claim of entitlement," and thus no protectable interest. *Hill*, 799 F.2d at 393.

Defendants argue that Plaintiff possessed no such protectable property interest because the City Board's decision to grant or deny a transportation permit or franchise agreement is discretionary, and no set of facts would compel the City Board to grant such permit. Under the Transportation Code, transportation permits can be issued to two broad categories of vehicles. One category consists of motor carriers, which Hot Springs organizes as taxicabs, limousines, sightseeing vehicles, and charter services. ECF No. 42-12, pp. 1, 4. The second category consists of public or private transportation, including trams, special events buses, public transit, specialty transit, and airport transit. ECF No. 42-12, p. 4, 26. The categories at issue here are sightseeing vehicles and specialty transit.

For sightseeing vehicles, hearing officers "shall conduct a public hearing to determine whether the applicant is fit, willing and able to properly perform the service proposed and to conform to this chapter and other applicable laws, ordinances and regulations." ECF No. 42-12, p. 6. When making a recommendation, the hearing officers[4] shall take into consideration:

> The character, business and financial responsibility and experience of the applicant and the probability that, if granted a permit or additional vehicle licenses, the applicant will operate his/her vehicle in accordance with the provisions of this chapter.
>
> (1) Whether any increase in the number of such vehicles operating in the city would produce or substantially increase traffic congestion.
>
> (2) If the application is for a sightseeing or charter service to be operated

[4]The Court understands the hearing officers to be the members of the Transportation Advisory Committee.

> within the Downtown Business District, the following additional criteria shall be considered . . . .
>
> *(3) Any other factors directly related to the grant or denial of the application which would substantially affect the public safety or convenience.*

ECF No. 42-12, p. 6 (emphasis added) (Code Section 13-1-13(3)(a)). The Code states that the Board of Directors considers these same factors when making its final determination. ECF No. 42-12, p. 6 (Code Section 13-1-13(3)(c)).

When granting a franchise for specialty transit services:

> [t]he board of directors is authorized to grant by ordinance one or more franchises for the operation of specialty transit as defined in this chapter or to operate said specialty transit directly as part of the public transit system. Said specialty transit shall operate for the purpose of transporting passengers for hire along a specialized route(s); provided, that the duration, terms, franchise fee, rates, insurance, conditions and procedures for granting and operating such franchise[s] are clearly stated in the franchise agreement and are *fair, reasonable and in the public interest as determined by the board of directors* . . . .

ECF No. 42-12, pp. 26-27 (Code Section 13-1-111) (emphasis added).

The text of these Code provisions demonstrates that the transportation permits are not issued based merely on meeting minimum eligibility or procedural requirements. Both categories of transportation permits require the City Board to weigh various factors, including public safety, convenience, and public interest, and to analyze the facts underlying each application. In fact, Plaintiff seems to agree with this reading of the code, noting that he is not arguing that "Defendants lacked discretion in every circumstance." ECF No. 5, p. 5. The ordinances at issue do not limit the City Board's discretion to deny a transportation permit sufficiently to grant Plaintiff a property interest.

Plaintiff contends that the text of the Code coupled with "repeated" representations by Defendants—specifically, Lana Kelly, the Intracity Transportation Manager—"assured Plaintiff

that he would receive his permit and be operating by January 1 if he completed all requirements before the hearing." ECF No. 49, p. 4. To support this argument, Plaintiff cites an email from Kelly to Plaintiff's business partner. ECF No. 25-11. The email states, "Attached is a list of the information we need to finish up your permit. Call me if you have questions. Thanks!" ECF No. 25, 11, p. 1. The attached list is as follows:

> - Photos of the vehicle. We have the manufacturer photo of a similar vehicle but we need photos of the vehicle that will be approved
> - You mentioned changing the name and we would need to know what the name is to be able to go forward with the permit.
> - We need to know the fee schedule – are they taking tips only, charging a set fee, or an hourly rate?
> - Map of the route you will be driving. You requested the same route as the carriages, if you would highlight on the attached map the route you want, we need to know exactly where the vehicle will be going.
> - Also attached is the annual vehicle license form. You need to schedule with the Police Department to perform the exam in section 2 before it goes to the [City Board]. You can put the vehicle on its trailer and take it to [Hot Springs Police Department] or you can schedule an officer to visit the vehicle at your storage site. Either way, it just needs to be completed so the [City Board] will know its road worthy.
>
> We need this information as soon as possible if we are going to make the next BOD meeting.

ECF No. 25-11, p. 2.

In his Statement of Facts, Plaintiff notes that this was an "initial list of requirements Plaintiff needed to complete to appear before the BOD." ECF No. 48, ¶ 12. The Court agrees with this assessment. The email simply highlighted what information was missing from Plaintiff's application and stated that he must present the missing information before he would be allowed to appear before the Board of Directors for the purpose of seeking approval for a transportation permit. Plaintiff does not cite any other evidence to support his argument that Defendants

"repeatedly represented that compliance with specified requirements guarantee him a permit, creating an understanding in Plaintiff that he was entitled to said permit." ECF No. 49, p. 5. Nowhere in the email with the attached list of requirements was a promise that if Plaintiff met certain *requirements*, he is guaranteed a transportation permit. Plaintiff does not cite to any other evidence showing that Defendants promised him a transportation permit if he met certain requirements. The Court finds that Plaintiff has presented insufficient evidence of the alleged promise to create a triable issue of fact. Accordingly, Court finds that Plaintiff did not possess a protectible property interest in obtaining a transportation permit from the City.

**2. Substantive Due Process Claim**

Plaintiff alleges that Defendants deprived him of his substantive due process in violation of the Fourteenth Amendment by failing to grant him a transportation license. "To plead a cognizable substantive due process claim, among other things, a plaintiff must plead a violation of a fundamental right." *Minn. Deer Farmers Ass'n v. Strommen*, 745 F. Supp.3d 770, 777 (citing *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017)).

In seeking to establish a deprivation of substantive due process, "Plaintiff faces an extremely high bar." *Hummel v. Minn. Dep't of Agric.*, 430 F. Supp. 3d 581, 590 (D. Minn. Jan. 2, 2020). "[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases . . . ." *Myers v. Scott Cnty.*, 868 F.2d 1017, 1019 (8th Cir. 1999). "To state a claim, [Plaintiff] must establish both that [D]efendants' conduct was 'conscience-shocking' and that [D]efendants 'violated one or more fundamental rights that are deeply rooted in this Nations's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Hummel*, 430 F. Supp. 3d at 590 (quoting *Slusarchuk v. Hoff*, 346 F.3d 1178, 1181-81 (8th Cir. 2003)). "The protections of substantive due process have

for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (internal citation omitted); *see Walker v. City of Kansas City, Mo.*, 911 F.2d 80, 95 (8th Cir. 1990) (observing that substantive due process has been "invoked to shelter fundamental individual rights from governmental interference in areas of child rearing and education, family relationships, procreation, and marriage").

Here, Plaintiff argues that Defendants' conduct threatened his "right to work and earn a living in his … chosen occupation." ECF No. 49, p. 7. In support of his argument, Plaintiff directs the Court to *Meyer v. Nebraska*, 262 U.S. 390 (1923), which describes a liberty interest "in the common occupations of life" in connection with a statute that prohibited the teaching of school in any language other than English. *Id.* at 399-400. Plaintiff also points to *Connecticut v. Gabbert*, 526 U.S. 286 (1999), which further defined the liberty interest in connection to the "complete prohibition of the right to engage in a calling." 526 U.S. at 291-91; *see also Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 874 (8th Cir. 2007).

Plaintiff challenges Defendants' refusal to grant him a transportation permit—a process created by city ordinance and governed by the City Board's discretion—so that he can operate his business. However, Plaintiff cites no cases to support his argument that a city government's refusal to issue a transportation permit is encompassed in the fundamental right to engage in one's chosen occupation. The right to a transportation permit is not in the same category as the fundamental rights to marry or bear children—that is, a right to receive a transportation permit is not deeply rooted in this country's history and tradition. The City Board has not deprived Plaintiff of his right to make a living or pursue his chosen occupation. Accordingly, Plaintiff has not established that he was denied a fundamental right.

Even if Plaintiff could identify a fundamental right at issue here, he must also allege that

the City Board's conduct shocks the conscience. Whether a government official's actions shock the conscience is a question of law. *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 674-75 (8th Cir. 2004). "To satisfy the conscience-shocking standard, a government official's conduct must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Hall v. Ramsey Cnty.*, 801 F.3d 912, 917-18 (8th Cir. 2015) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 847-48 n.8 (1998)). Conduct that is "intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *City of Sacramento*, 5223 U.S. at 849.

Defendant's alleged conduct in shepherding Plaintiff through the process of obtaining a transportation permit cannot be characterized as "conscience-shocking." It appears that Defendants were providing Plaintiff with information for the purpose of helping him through the process. At most, he may have been given some erroneous information during the process. Even if Defendants did give Plaintiff some erroneous information, there is no evidence in the record that this conduct was intended to injure Plaintiff without any justifiable government interest or was otherwise so egregious as to be conscience-shocking. The evidence suggests that, while Plaintiff was attempting to obtain a transportation permit, Defendants were simply making routine decisions regarding the governance of the transportation permit process. Accordingly, the Court finds that Defendants' conduct is not so egregious or outrageous that it could be considered conscience-shocking.

**B. Fourteenth Amendment Equal Protection Claim**

Plaintiff claims that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by treating him differently than other similarly situated specialty transit applicants. "The Equal Protection Clause 'commands that no State shall deny to any person within its

jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.'" *Sanimax USA, LLC v. City of South St. Paul*, 95 F.4th 551, 563-64 (8th Cir. 2024) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). Plaintiff does not allege that he is a member of a discrete group but argues that Defendants singled him out as a "class of one" by failing to grant him a transportation permit.

Both the Supreme Court and the Eighth Circuit Court of Appeals have "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Mensie v. City of Little Rock*, 917 F.3d 685, 692 (2019) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). The "threshold inquiry" is whether the class-of-one plaintiff is "similarly situated to others who allegedly received preferential treatment." *Sanimax USA*, 95 F.4th at 565 (quoting *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015)). This presents a "significant hurdle" for the plaintiff because "the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in *all material respects*." *Id.* (emphasis in original) (quoting *Robbins*, 794 F.3d at 996). "[W]hen plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities 'must be very similar indeed.'" *Id.* at 565 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007)). "Absent such a showing, a class-of-one claim must fail." *Id.* (citing *Robbins*, 794 F.3d at 996).

The allegedly "similarly situated" entities identified by Plaintiff are other "specialty transit applicants," such as JJ's Pedicabs and horse-drawn carriages.[5] Plaintiff claims that the carriages

[5]The only specialty transit applicant identified in Plaintiff's brief in support of his response to the summary judgment motion is JJ's Pedicabs. ECF No. 49, p. 15. In his Statement of Facts, Plaintiff states that "carriages and pedicabs are specialty transit vehicles and are similarly situated to Plaintiff, because they are primarily powered by animals or some other novel means, they are large slow vehicles, and they are difficult to pass." ECF No. 48, ¶.31.

and pedicabs operate on at least a portion of Central Avenue and were not required to obtain ARDOT approval to travel on Central Avenue. Plaintiff further claims that the City did not go out of its way to solicit safety concerns regarding the pedicabs and carriages, did not require them to appear twice before the TAC, and allowed them to change their routes without TAC approval.

Defendants argue that the pedicabs and horse-drawn carriages are not similarly situated specialty transit applicants. The Court agrees. The pedicabs typically transport one or two people, do not have motors, and weigh much less than Bubbles. The horse-drawn carriages weigh approximately 1,000 pounds and carry up to four passengers. Bubbles weighs approximately 2,425 pounds, is approximately six feet wide, and can transport more than eight people. Further, there is no evidence in the record that, during the transit permit application process, the pedicabs and the carriages amended their operating routes such that the routes were different than what had been originally approved by TAC or appeared before the City Board with incomplete and inconsistent information. Plaintiff has failed to provide sufficient evidence that the pedicabs or the horse-drawn carriages are similarly situated "in all relevant respects" to Bubbles as is required to prove an equal protection claim. *See Sanimax USA*, 95 F.4th at 565. Accordingly, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

Even if Plaintiff could show that Bubbles was similarly situated to the pedicabs or carriages, his claim would still fail. When an equal protection claim is neither based on a suspect class or grounded in a fundamental right, it is subject to rational basis review. *Gilmore v. Cnty. of Douglas, State of Neb.*, 406 F.3d 935, 937 (8th Cir. 2005). Under rational-basis review, "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," then the challenged treatment does not violate the Equal Protection Clause. *Heller v. Doe*, 509 U.S. 312, 320 (1993). The burden is on Plaintiff to negate "any reasonably conceivable

state of facts that could provide a rational basis" for the City's conduct. *Id.* Whether Defendants' treatment of Plaintiff survives rational-basis review is a question of law for the Court to answer. *See Myers v. Cnty. of Orange*, 157 F.3d 66, 75 n. 3 (2d Cir. 1998).

Plaintiff does not address the rationality of the City's conceivable safety and administrative concerns but instead argues that Defendants' conduct was motivated by animus and a desire to sabotage the process. Thus, Plaintiff has failed to meet his burden to negate any reasonably conceivable rational basis for the City's conduct. Further, it appears to the Court that any difference in treatment was based on legitimate concerns of the City Board and employees, such as inconsistent information being provided by Plaintiff during the transit permit application process, missing information in his application, and the City's legitimate safety and traffic flow concerns. The Court cannot find that any of the alleged differences in treatment was irrational as to offend the Equal Protection Clause.

**C. Qualified Immunity**

In assessing whether Defendants are entitled to qualified immunity, the Court must answer two questions: "(1) whether the facts, viewed in the light most favorable to . . . [P]laintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation." *Presson v. Reed*, 65 F.4th 357, 365 (8th Cir. 2023) (quoting *McDaniel v. Neal*, 44 F.4th 1085, 1088-89 (8th Cir. 2022). Defendants "are entitled to qualified immunity unless the answer to both of these questions is yes." *Id*. The Court may consider the questions in either order. *Id.* Here, as discussed above, the Court has determined that the facts, viewed in the light most favorable to Plaintiff, do not demonstrate the deprivation of a constitutional right. Accordingly, the Court finds that Defendants, in their individual capacities, are entitled to qualified immunity as to the federal constitutional claims under 42 U.S.C. § 1983.

Because Defendants are entitled to qualified immunity, the Court must grant summary judgment in favor of Defendants as to these claims.

**D. Official Capacity Claims**

An official capacity claim against a defendant is "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Plaintiff's official capacity claims, were they cognizable, would have been treated as claims against the City of Hot Springs. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). However, the Court has already determined that Plaintiff's constitutional rights were not violated by any individual Defendant. Thus, the official capacity claims are dismissed.

**E. ACRA Claims**

Plaintiff has also filed claims under the ACRA, which provides a cause of action for deprivation of rights secured by the Arkansas Constitution. Ark. Code Ann. § 16-123-105. Pursuant to the ACRA, Plaintiff claims that Defendants violated his due process and equal protection rights under the Arkansas Constitution, Article II, §§ 2-3. The ACRA allows courts to look to federal civil rights law for guidance when construing the ACRA. Ark. Code Ann. § 16-123-105(c). Here, the parties do not argue that any of Plaintiff's ACRA claims warrant a separate analysis than his federal claims. Thus, the Court applies its rulings on the federal constitutional claims under §1983 to Plaintiff's state constitutional claims under the ACRA. As discussed above, the Court finds that the facts, viewed in the light most favorable to Plaintiff, do not demonstrate the deprivation of a constitutional right. Accordingly, the state constitutional claims must be dismissed for the same reasons as the federal constitutional claims.

**F. Remaining State Law Claims**

The sole basis for the Court's jurisdiction over the remaining state law gross negligence

claim is 28 U.S.C. § 1367(a), which permits a district court to exercise supplemental jurisdiction over claims that are a part of the same case or controversy as the claims that fall within the district court's original jurisdiction. Under 28 U.S.C. § 1367(c)(3), the Court may, in its discretion, decline to exercise supplemental jurisdiction over remaining state law claims when all claims over which it has original jurisdiction have been dismissed. Having granted summary judgment in favor of Defendants on Plaintiff's federal claims and state law claims that are predicated on the ACRA and the state constitution, the Court declines to exercise jurisdiction over Plaintiff's remaining state law gross negligence claim.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Defendants' Motion for Summary Judgment (ECF No. 40) should be and hereby is **GRANTED**. Plaintiff's claims under 42 U.S.C. § 1983 and ACRA are **DISMISSED WITH PREJUDICE**. Plaintiff's state law gross negligence claim is **DISMISSED WITHOUT PREJUDICE**. A judgment of even date shall issue.

**IT IS SO ORDERED**, this 31st day of August, 2026.

/s/ Susan O. Hickey
Susan O. Hickey
Senior United States District Judge